# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:12-CR-1-TLS |
| | ) | |
| SERGIO ALVAREZ-ARELLANO | ) | |

## OPINION AND ORDER

This matter is before the Court in anticipation of Defendant Sergio Alvarez-Arellano's sentencing. The Defendant has pled guilty to knowingly and intentionally possessing with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). He requests that the Court find that he qualifies for the "safety valve" provisions set forth in § 5C1.2 of the United States Sentencing Guidelines and in 18 U.S.C. § 3553(f), and sentence him below the five-year statutory mandatory minimum term of imprisonment required by 21 U.S.C. § 841(b)(1)(B). The Government argues that the Defendant has not met the qualifications of the safety valve because he did not truthfully provide to the Government all information and evidence that he has concerning the cocaine delivery to which he pleaded guilty, and any other activities that were part of the same course of conduct or plan.

## BACKGROUND

**A.     The Offense**

The Defendant's drug conviction arises out of conduct that took place in Fort Wayne on January 17, 2012, and before. In November 2011, Fort Wayne Police Department (FWPD) Officer Darrick Engelman was working undercover in connection with a drug investigation when he was introduced to Francisco Garcia-Hernandez. Officer Engelman made several controlled

purchases of cocaine from Garcia-Hernandez over the course of a couple months. On January 17, 2012, Officer Engelman arranged to purchase a kilogram of cocaine from Garcia-Hernandez, but Garcia-Hernandez advised that he only had access to a half kilogram. Officer Engelman agreed to purchase the half kilogram for $15,750. Officers arrest Garcia-Hernandez after he completed the cocaine transaction with Officer Engelman.

After his arrest, investigators interviewed Garcia-Hernandez and he agreed to cooperate against his supplier. Garcia-Hernandez explained that when Detective Engelman asked to buy a kilogram of cocaine on January 17, Garcia-Hernandez already had a half kilogram of cocaine in his possession. Had he not been arrested, he would have met with his supplier later in the day to get the other half of the kilogram of cocaine that Officer Engelman had requested. During this meeting he also intended to give his supplier money from the half kilogram transaction with Officer Engelman as well as $11,000 from a previous deal. Although Garcia-Hernandez did not know the supplier's name because they never asked or shared those details with each other, he said that the supplier could be driving a blue or black Lincoln sedan or a black sport utility vehicle (SUV), and identified an image of a Mark IV as the potential vehicle. He identified the supplier as being a Hispanic male, short hair, possibly with a goatee. Garcia-Hernandez had the supplier's telephone number stored in his phone.

At the request of the investigators, Garcia-Hernandez agreed to use his phone to call his supplier and set up a meeting for about an hour later. The conversations between Garcia-Hernandez and his supplier, which were in Spanish, were put on speaker so that a Spanish speaking detective could listen. Garcia-Hernandez and his supplier agreed to meet at the Advanced Auto store located at McKinney and Lafayette in Fort Wayne. During at least one of

2

these conversations, the detective heard the supplier confirm to Garcia-Hernandez that he had the "other half" with him, meaning the other half-kilogram of cocaine, and Garcia-Hernandez confirmed that he had the "papers," or money that he owed the supplier.

Garcia-Hernandez remained in custody with Officer Engelman and the Spanish-speaking detective while Detective Marc DeShaies and Officer John Drummer went to Advanced Auto. They parked their cars out of sight of the Advanced Auto parking lot, but directly in line with each other. Detective DeShaies was in an unmarked, dark blue, Impala. Officer Drummer's car was a fully-marked squad car with a K-9 unit. Meanwhile, undercover officers waited in the Advanced Auto parking lot in a silver Dodge truck. With officers already in position at the auto parts store, Garcia-Hernandez made another call on speaker phone, and the supplier confirmed that he was a few blocks away from the "place of oils" and that he was expecting Garcia-Hernandez to be there in a few minutes. As the meeting was ready to occur, the supplier called Garcia-Hernandez and said that he was already there at the auto parts store but did not see Garcia-Hernandez. Garcia-Hernandez informed the supplier that he was waiting in a silver Dodge truck. The supplier seemed to get nervous, telling Garcia-Hernandez not to "play" him.

The information from the call was relayed to the officers waiting at the auto parts store, and they requested that the detective ask Garcia-Hernandez what the supplier was driving. Garcia-Hernandez responded that it was possible that he was driving a small, black, truck-like vehicle. Task Force Officer Wagner, who was waiting in the silver truck, had observed the arrival of a black Saturn Vue with a Notre Dame license plate. The Saturn entered the store parking lot from McKinney, passing the undercover truck and proceeding through the parking lot. As the Saturn drove through the parking lot, it slowed down, and TFO Wagner could see that

3

the brake lights kept coming on. TFO Wagner also saw the driver and sole occupant looking around. The driver of the Saturn did not park and enter the store, but exited the parking lot toward the south side of the building.

Detective DeShaies noticed a black Saturn Vue exit an alleyway and drive past his location. The driver of the Saturn noticed the police cars and responded by slowing almost to a stop to look at the officers and then accelerating. Detective Deshaies was able to confirm a Notre Dame license plate and a male Hispanic driver with a physical description consistent with the description provided by Garcia-Hernandez. Detective DeShaies believed that the driver's response to the presence of police vehicles indicated that he was trying to leave the area in a hurry, and Detective DeShaies decided to follow him to gather more information. The driver squealed his tires as he made a quick, hard turn, without signaling. Detective DeShaies followed, going 45 miles per hour in a 30-mile-per-hour zone but failed to gain ground. The driver made another hard, quick turn, without signaling. Detective DeShaies, when he made the same turn, could no longer see the car, but saw a plume of dust coming from a gravel alley that backed up to the rear garages of houses in a residential area. Detective DeShaies turned into the alley in time to see the Saturn turn into a small residential backyard, stopping just a few feet from the back of the house. A fence blocked access to the street in front of the house.

As Detective Deshaies arrived, he observed the Saturn's driver (and sole occupant) reaching over to the right toward the passenger side. The driver, later identified as the Defendant, opened the car door and began to exit as officers approached. Despite being told not to get out of the vehicle, the Defendant continued to exit the Saturn, and he was immediately handcuffed. Officer Drummer arrived at the scene about 20 seconds after Officer Deshaies arrived. Within a

4

few minutes of arriving, Officer Drummer's drug dog performed a drug sniff around the exterior of the Saturn and gave a positive alert at the driver's side door, indicating the presence of illegal drugs in the Saturn. Prior to the dog alert, the Defendant was patted down for weapons, with none found, and officers opened the passenger door to make sure that there were no weapons in that area. The driver-side door had been left open by the Defendant when he exited the Saturn. Detective Deshaies lowered his head and looked under the driver's seat from the outside of the Saturn. He saw a plastic grocery bag with an item inside. Based upon the dog alert, the information about the meeting with Garcia-Herndandez, and the size of the item inside the bag, Detective Deshaies believed the plastic bag contained the half-kilogram of cocaine to be delivered to Garcia Hernandez. The bag did in fact contain approximately a half kilogram of cocaine. Garcia-Hernandez's telephone had been in contact with a cellular telephone located in the glove compartment. The occupants of the home where the Defendant stopped his vehicle stated that they did not know the Defendant.

**B.     Presentence Investigation Report**

On June 28, 2013, a probation officer prepared a Presentence Investigation Report in anticipation of the Defendant's sentencing, which anticipated that the Defendant was eligible for the safety valve. The Government objected to the officer's inclusion of the safety valve in the offense level calculation on grounds that the Defendant had not yet provided a statement regarding his knowledge and involvement in the offense. The Government also expressed concern whether the Defendant's flight from officers on January 17, 2012, prior to his arrest would constitute the use of violence, and provide yet another reason to deny the safety valve.

The probation officer revised the report. After the revision, the Defendant's total offense level of 23 and criminal history category of I yield an advisory guideline range of 46 to 57 months of imprisonment. But because the statutory mandatory minimum sentence of 5 years is more than the guideline range, the mandatory minimum became the guideline sentence.

**C.     Proffer Interview**

The Defendant was interviewed on November 7, 2013. Two interpreters, in addition to a Spanish-speaking agent were present. The Government attorney explained to the Defendant the importance of telling the truth to qualify for the safety valve, and stated that the interview was being conducted for the Defendant's benefit. At the beginning of the interview, the Defendant did not provide accurate information, even denying that he ever had dealings with Garcia Hernandez before the day of his arrest. He also claimed that he obtained the cocaine from an unknown person he met when he was in a bar, and he had never dealt with this person before. The Government did not believe that the Defendant was making any attempt to provide truthful information about the offense. The agents and the AUSA left the room to give the Defendant's counsel an opportunity to talk to the Defendant and salvage the proffer.

After the break to reiterate the importance of being truthful, the Defendant admitted to setting up delivery of a half kilogram of cocaine to Garcia Hernandez. He discussed with agents that another half kilogram was set to be delivered at another date, but it was not delivered because he was apprehended. He also told the agents the half kilogram was hidden under the vehicle he was driving the day of his arrest, and it was wrapped in gray tape. He explained that he was expecting payment of $31,000 from Garcia Hernandez, and that he had fronted the first

half kilogram of cocaine to Garcia-Hernandez. He stated that he met an individual in a bar in Chicago who gave him the kilogram of cocaine in South Bend.

Apart from these details, the Defendant provided very little information. He admitted to buying the cocaine for $30,000, but would not say how he got the $30,000. He explained that his supplier was an older, Hispanic, male, but would not provide a name, nickname, address, or further physical description. He said his supplier drove a blue Chevy truck, but provided nothing further about the truck. The Defendant told agents the supplier's telephone number was in his phone, but not what name or description it was listed under or any of the digits in the phone number. The Defendant did not explain why he was in Chicago and denied knowing the location of the gas station in South Bend where he picked up the kilogram of cocaine. The Defendant claimed that he did not know the name or description of the individual who introduced him to the supplier, or the name or description of the individual who introduced him to Garcia Hernandez, even though he played soccer with the man. The Defendant stated that he had two other distributors beside Garcia-Hernandez, but he could not provide their names, nicknames, addresses, or vehicles. The only description he provided was that one was a white guy and one was a Mexican guy.

### D.     Evidentiary Hearing

On February 12, 2014, the Court conducted an evidentiary hearing to address whether the Defendant provided truthful information to the Government as required to make him eligible for safety valve consideration. The Defendant testified at the hearing. He admitted that he was not immediately truthful during the proffer, but maintained that he was unable to provide additional

7

information and details during the proffer because he did not know those details. For example, he stated that he did not know the name of his supplier, his distributors, or the people who introduced him to the supplier or to Garcia-Hernandez. He also maintained that the statements he made about his supplier were true, such as the fact that he met him in a bar in Chicago.

Regarding his flight from police and eventual apprehension, the Defendant admitted that he stated during his proffer that he did not know police were following him. He said that he did not accelerate rapidly, did not see a marked car, did not speed through a neighborhood, and did not squeal his tires, and he maintained that these statements were accurate. At the evidentiary hearing, when the Defendant was asked why he drove into the backyard to hide, he stated that he was not attempting to hide. He submitted that when he did not see Garcia-Hernandez, he suspected something was going on and decided to go spend time with friends. He also said he was suspicious when Garcia-Hernandez told him he was driving a silver truck because he never drove a silver truck before. Although the Defendant said the backyard belonged to the friends he wanted to visit, he could not provide their names. He knew only that their nickname was Torro. When questioned why he drove into the back yard, he said that the location in the grass in the back yard was where he usually parked when visiting these friends. During the hearing, the Defendant acknowledged that the people he stated were his friends denied that they knew him. He did not provide any explanation for their denial, and stated that they were not people who bought drugs from him.

During the hearing, Government counsel also asked the Defendant whether he told Garcia-Hernandez not to try to play him on the day he was apprehended. The Defendant answered that he did not remember if he said that. However, during his November 7 interview,

the Defendant denied to the interviewers that he said that to Garcia-Hernandez. When confronted with this denial at the hearing, the Defendant stated that he did not remember if he denied it during the proffer.

Detective Adalberto Martinez, who speaks Spanish and was present during the Defendant's interview, also testified at the evidentiary hearing. In addition to recounting the fact that the interview was stopped after about thirty to forty-five minutes because agents did not believe the Defendant was being truthful, Detective Martinez described having to ask questions several times and continually reiterate that the agents wanted the Defendant to be truthful even after the break. Although the Defendant admitted he had been lying and wanted to start telling the truth, Detective Martinez believed that the Defendant was still holding back information the agents were asking him to provide. Detective Martinez admitted that the Defendant was probably uncomfortable providing answers about who he was working with or where he was receiving his cocaine, and would not necessarily know certain details such as addresses and real names.

## DISCUSSION

Congress enacted the safety valve statute, § 3553(f), to allow certain nonviolent, first-time drug offenders who were not organizers of criminal activity to avoid the application of statutory mandatory minimum sentences if they cooperated with the government. *United States v. Arrington*, 73 F.3d 144, 147 (7th Cir. 1996).

> Section 3553(f) was intended to benefit defendants who wished to cooperate with the government (and in fact did everything they could to cooperate) but simply had no new or useful information to provide. But § 3553(f) was intended to benefit only those defendants who truly cooperate. Thus, to qualify for relief under § 3553(f), a defendant must demonstrate to the court that he has made a good faith attempt to cooperate with the authorities.

9

*Id.* at 148.

The statute sets forth five criteria that a defendant must satisfy to be eligible to receive a sentence without regard to the mandatory minimum; the only one at issue in this case is whether

> (5) not later than the time of the sentencing hearing, *the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan*, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C.A. § 3553(f)(5) (emphasis added).[1] The statutory language of § 3553(f) is duplicated in Guideline § 5C1.2(a)(1)–(5). "The defendant bears the burden of proving by a preponderance of [the] evidence his eligibility for the safety valve." *United States v. Montes*, 381 F.3d 631, 634 (7th Cir. 2004). "To carry his burden, the defendant must persuade the district court that he has made full, truthful disclosure of information required by the safety valve." *United States v. Aidoo*, 670 F.3d 600, 607 (4th Cir. 2012).

The disclosure of information extends to offenses that were part of the same course of conduct or of a common scheme or plan. U.S.S.G. § 5C1.2(a)(5). This means the "offense of conviction and all relevant conduct." *Id.*, cmt. n.3. Relevant conduct, in turn, includes:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for

---

[1] During the evidentiary hearing, the Government indicated that it was withdrawing its argument that the Defendant's flight from police on the day of his arrest violated the provision of the safety valve that requires that a defendant not use violence in connection with the offense. *See* U.S.S.G. § 5C1.2(a)(2).

> that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1). Given the scope of the required disclosure, the admission of facts that render the defendant culpable for his own conduct is not enough if other relevant facts are excluded. *Montes*, 381 F.3d at 635–636 ("Despite [the defendant's] claim that his candor regarding the events of his arrest is irrelevant because he admitted enough facts to render him culpable, the safety valve does not so restrict the type of information that a defendant must provide."); *see also United States v. Nunez*, 627 F.3d 274, 282 (7th Cir. 2010) (finding the defendant ineligible for safety valve where he was unwilling to discuss his customers and co-defendants and was only willing to discuss particular suppliers); *United States v. Ponce*, 358 F.3d 466, 468–69 (7th Cir. 2004) (affirming district court's denial of safety valve where the defendant admitted arranging interstate shipment of drugs and related facts, but disputed the credible representations of undercover federal agent that he was present at the drug pick-up); *United States v. Alvarado*, 326 F.3d 857, 862 (7th Cir. 2003) (affirming denial of safety valve where the defendant admitted that he had received a shipment of drugs from his sister but had not disclosed his sister's contact information).

The question here, then, is if despite the admission of his own misconduct, the Defendant has excluded relevant facts regarding the acts of himself and others in furtherance of the commission of the offense, such that his omissions render him ineligible for the safety valve. Importantly, the Court finds that, despite the Defendant's statements regarding his lack of knowledge of certain details regarding other persons involved in the distribution of the kilogram of cocaine, his failure to disclose even the most basic of information is not the result of his lack of knowledge. Instead, it is the result of his unwillingness to provide such information. Were it

11

simply a lack of knowledge, the Defendant would still qualify for the safety valve. *See* U.S.S.G. § 5C1.2 (a)(5) (noting that the safety valve is intended to aid low level drug offenders, even if they have no "relevant or useful other information to provide" or "the Government is already aware of the information"). It is unbelievable that the Defendant would not know some of the pertinent details he was asked to provide given his role in the drug trafficking scheme. The offense of conviction alone required the Defendant to pay for and obtain a large quantity of cocaine from his source. He either financed the purchase himself, or someone else trusted him with $30,000 to purchase the kilogram of cocaine. He was then responsible to sell the cocaine to others in large quantities for further distribution. The Defendant himself negotiated the sale of the drugs to Garcia Hernandez, and personally delivered the drugs with full knowledge of the drug type, quantity, and value. The Defendant, either based on his own decision-making authority or direction from another, fronted a half kilogram of cocaine to Garcia Hernandez. He then negotiated a second sale for another half kilogram and arranged for payment. Garcia-Hernandez was not the only person that the Defendant supplied cocaine to.

It is also difficult to believe that the Defendant was not intentionally withholding important details in light of other falsehoods. The Defendant established early in the proffer interview that he had no aversion to being dishonest. In this Circuit, lying is considered to be "inconsistent with a good-faith effort to cooperate," and a sentencing judge may refuse the safety valve to a defendant who was caught lying during a safety-valve debriefing even if he later attempts to cure the lies. *United States v. Acevedo-Fitz*, 739 F.3d 967, 970 (7th Cir. 2014) (holding that a defendant who lied during a safety-valve debriefing was not acting in good faith and was not within the class of offenders Congress intended to protect from potentially harsh

mandatory minimum sentences). The Defendant's lack of candor became evident to the Court during his testimony at the evidentiary hearing. For example, even his account of the pursuit that precipitated his arrest, which he gave to this Court under oath, reflected his guarded attitude toward a full admission of guilty behavior.

Having determined that the Defendant intentionally withheld important information, *United States v. Nunez* is instructive. In *Nunez*, the defendant placed limits on the topics he was willing to discuss with the government. 627 F.3d at 281–82 (defendant "was unwilling to discuss his customers and his co-defendants, and he was only willing to discuss particular suppliers"). Here, the Defendant obtained the cocaine that he distributed in half kilo quantities to Garcia-Hernandez from someone else, a source. Although the Defendant did not explicitly limit the topics of discussion, he implicitly excluded his supplier, and anyone connected to his supplier. As was true in *Nunez*, the limitations on the topics of discussion "demonstrate that [the Defendant] failed to provided the government with 'all information and evidence' he had 'concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan.'" 627 F.3d at 282 (quoting 18 U.S.C. § 3553(f)(5)). The Defendant, for reasons that may be quite compelling, has chosen not to provide any details that would allow law enforcement to identify his supplier, financial source, or other distributors. Regardless of his reasons, the Defendant cannot expect, under the current law, to receive the benefit of the safety valve provision after making such a choice to withhold information concerning the offense. *See, e.g.*, *United States v. Pena*, 598 F.3d 289, 292 (6th Cir. 2010) (stating that the court had no authority to create a public policy exception to the safety valve provision's requirement of full and truthful disclosure even where the disclosure was likely to trigger retribution); *United States*

*v. Roman-Zarate*, 115 F.3d 778, 785 (10th Cir. 1997) (holding that a defendant who remains silent and chooses "not to divulge names of his drug couriers or contacts because he suspects his colleagues-in-crime may be less than supportive of his decision . . . is no longer entitled to special treatment from the district court" through application of the safety valve).

      The Defendant argues that by requiring him to provide more information than he already has regarding his offense would be making the burden more like that required for obtaining a substantial assistance departure under U.S.S.G. § 5K1.1. The drug offenders who are eligible for such departures have substantial, useful knowledge that will aid the government in "the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. The safety valve, on the other hand, is intended to aid low level drug offenders, even if they have no "relevant or useful other information to provide" or "the Government is already aware of the information." U.S.S.G. § 5C1.2 (a)(5). Thus, the Defendant would be entitled to the safety valve reduction even if he had no useful information. It is not the lack of useful information that had made the Defendant ineligible. Rather, it is his lack of good faith effort to cooperate by providing the information he actually possesses. Whether such cooperation should be required in the analysis of culpability for low level drug offenders, and thus necessary to discount a mandatory minimum is not within this Court's authority to address. Congress has elected to require that a defendant show a good faith attempt to cooperate with the authorities, and this Court must deny application of the safety valve provision under the circumstances of this case.

## CONCLUSION

For the reasons stated above, the Court finds that the Defendant has not established that he is eligible to be sentenced under the safety valve provisions set forth in 18 U.S.C.A. § 3553(f) and U.S.S.G. § 5C1.2(a)(1)–(5). The Court now schedules the Defendant's sentencing hearing for March 27, 2014, at 11:00 AM before Judge Theresa L. Springmann.

SO ORDERED on February 27, 2014.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT